# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BRANDON ALVES; NICHOLAS BERNAT; DOMINIC HAWKINS; VICTORIA COSTA; GENE HULL; JARRAD BROOKS; DANIEL RANAHAN; ALEJANDRO PIREZ; MICHAEL PETERSON; SAWANDI CASSELL; ROBERT BISSONNETTE; ANDREW SEBRING; SECOND AMENDMENT FOUNDATION, INC.; COMMONWEALTH SECOND AMENDMENT, INC., | ) ) ) ) ) ) ) ) ) | CIVIL ACTION NO. 1:20-cv-11933-DPW |
| Plaintiffs, | ) ) ) | |
| -against- | ) ) ) | **PLAINTIFFS'** |
| DONNA M. MCNAMARA, in her official capacity as Police Chief of the Town of Stoughton; RICHARD FULLER, in his official capacity as the Chief of Police of Weymouth; EMANUEL C. GOMES, in his official capacity as acting police chief of the city of Brockton; DAVID SHOEMAKER, in his official capacity as police chief of the town of Warwick; BRANVILLE G. BARD, JR., in his official capacity as Police Commissioner for the City of Cambridge; THOMAS GAMMEL, in his official capacity as police chief of the town of Lunenburg; DAVID JONES, in his official capacity as interim police chief of the town of Hingham; WILLIAM G. GROSS, in his official capacity as police commissioner of the city of Boston; SCOTT LABONTE, in his official capacity as police chief of the town of Berkley; BRIAN KYES, in his official capacity as police chief of the town of Chelsea; NEIL F. OUELLETTE, in his official capacity as police chief of the town of Danvers; MARK SAVASTA, in his official capacity as police chief of the town of Paxton, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **MEMORANDUM OF LAW IN SUPPORT OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| Defendants. | ) ) ) | |

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................................*ii*

**INTRODUCTION** ...........................................................................................................1

**PERTINENT FACTS, STATUTES & REGULATIONS**.............................................1

    A)    A Person Must Have a License in Order to Possess or Acquire a Firearm ....................1

    B)    The Defendants Have Closed Off or Severely Delayed Access to Firearms Licenses, Preventing the Plaintiffs from Acquiring or Possessing Firearms ...............................3

**ARGUMENT** .................................................................................................................7

    I)    The Plaintiffs are Likely to Succeed on the Merits........................................................7

    II)    An Injunction is Needed to Prevent Irreparable Injury ................................................17

    III)    The Balance of Hardships Favors the Plaintiffs..........................................................18

    IV)    The Public Interest Favors Issuance of the Requested Injunction ..............................19

**CONCLUSION** ............................................................................................................20

## **TABLE OF AUTHORITIES**

### **Cases**

*American Civil Liberties Union v. Ashcroft*, 322 F.3d 240 (3d Cir. 2003),
    *aff'd*, 542 U.S. 656 (2004) .......................................................................................... 19

*Bateman v. Perdue*, 881 F. Supp. 2d 709 (E.D.N.C. 2012) .................................... 12-13

*Blount v. Redmond*, 649 F. Supp. 319 (D. Me. 1986) .................................................. 18

*Boston v. Super*, 531 F.3d 1 (1st Cir. 2008) ................................................................... 7

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151 (1st Cir. 2004) ....... 18

*City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988) ...................... 9

*Commonwealth v. Adams*, 482 Mass. 514, 125 N.E.3d 39 (2019) ................................ 3

*Commonwealth v. Paul*, 96 Mass. App. Ct. 263, 132 N.E.3d 544 (2019) ..................... 1

*Connecticut Citizens Defense League v. Lamont*, No. 3:20-cv-00646, 2020 WL 3055983
    (D. Conn. Jun. 8, 2020) ("*CCDL v. Lamont*") ............................................ 10-12, 18

*Corporate Technologies, Inc. v. Harnett*, 731 F.3d 6 (1st Cir. 2013) ......................... 19

*De Vito v. McGuire*, 475 N.Y.S.2d 730, 124 Misc. 2d 65 (Sup. Ct. 1984) ................... 10

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ............................................. *passim*

Elrod v. Burns, 427 U.S. 347 (1976) ............................................................................ 17

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) .......................................... 14, 17

*FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449 (2007) ................................................... 15

*Forchion v. Intensive Supervised Parole*, 240 F. Supp. 2d 302 (D.N.J. 2003) ........... 19

*Freedman v. Maryland*, 380 U.S. 51 (1976) ................................................................... 9

*FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990) .................................................... 9

*Gonzalez-Droz v. Gonzalez-Colon*, 573 F.3d 75 (1st Cir. 2009) ................................... 7

*Gould v. Morgan*, 907 F.3d 659 (1st Cir. 2019) ...................................................... 14-15

*Grace v. District of Columbia*, 187 F. Supp. 3d 124 (D.D.C. 2016) ........................... 18

*Held v. Hanlin*, 244 P.3d 895, 239 Or. App. 486 (Or. Ct. App. 2010) ....................... 10

*Hightower v. City of Boston*, 693 F.3d 61 (1st Cir. 2012) ........................................... 15

*Hyde Park Partners, L.P. v. Connolly*, 839 F.2d 837 (1st Cir. 1988) ......................... 19

*McCarthy v. Baker*, No. 1:20-cv-10701 (D. Mass. filed Apr. 9, 2020) .................. 13, 15

*McCullen v. Coakley*, 573 U.S. 464 (2014) ............................................................ 16-17

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ................................................. 8, 20

*McNeese v. Bd. of Education*, 373 U.S. 668 (1963) ..................................................... 10

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ....................................................... 16

*Motley v. Kellogg*, 409 N.E.2d 1207 (Ind. Ct. App. 1980) .........................................................10

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
   700 F.3d 185 (5th Cir. 2012) ..............................................................................................14

*New Coram Wireless Services v. Sprintcom, Inc.*, 287 F.3d 1 (1st Cir. 2002).............................7

*Patsy v. Bd. of Regents*, 457 U.S. 496 (1982) ...........................................................................10

*Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670 (1st Cir. 1998)................................................7

*Reid v. Donelan*, 390 F. Supp. 3d 201 (D. Mass. 2019) ............................................................19

*Reno v. ACLU*, 521 U.S. 844 (1997) .........................................................................................15

*Ross-Simons of Warwick, Inc. v. Baccarat*, 102 F.3d 12 (1st Cir. 1996)...................................18

*Rushia v. Town of Ashburnham*, 701 F.2d 7 (1st Cir. 1983)......................................................18

*Salute v. Pitchess*, 132 Cal. Rptr. 345, 61 Cal. App. 3d 557 (Cal. Ct. App. 1976) .....................10

*Silvester v. Becerra*, 138 S. Ct. 945 (2018)..............................................................................20

*Stilp v. Contino*, 613 F.3d 405 (3d Cir. 2010) ...........................................................................18

*Teixeira v. County of Alameda*, 822 F.3d 1047 (9th Cir. 2016)..................................................14

*United States v. Carolene Products Co.*, 304 U.S. 144 (1938) ..................................................15

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2009)..............................................13-15, 18

*United States v. Playboy Entertainment Group*, 529 U.S. 803 (2000) .......................................15

*United States v. Rene E.*, 583 F.3d 8 (1st Cir. 2009) .................................................................15

*Vance v. Universal Amusement Co.*, 445 U.S. 308 (1980) ..........................................................9

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ..................................................................16

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008)........................................7

**Statutes**

18 U.S.C. § 921 ..........................................................................................................................1

42 U.S.C. § 1983.........................................................................................................................9

Chicago, Ill., Municipal Code § 8–20–040 (2009) (repealed) ........................................................8

Chicago, Ill., Municipal Code § 8–20–050 (2009) (amended) .......................................................8

Conn. Gen. Stat. § 29-17c .........................................................................................................10

Conn. Gen. Stat. § 29-28 ...........................................................................................................11

Conn. Gen. Stat. § 29-28a ..........................................................................................................11

Conn. Gen. Stat. § 29-29 ...........................................................................................................11

Conn. Gen. Stat. § 29-33 ...........................................................................................................11

Conn. Gen. Stat. § 29-35 ...........................................................................................................11

Conn. Gen. Stat. § 29-36g ..........................................................................................................11

Conn. Gen. Stat. § 29-37a ...........................................................................................11

Conn. Gen. Stat. § 29-37q ...........................................................................................11

D.C. Code § 7-2502.01 (2001) (amended)....................................................................8

D.C. Code § 7-2502.02 (2001) (amended)....................................................................8

M.G.L. c. 140, § 121 ................................................................................................1, 3

M.G.L. c. 140, § 129B .....................................................................................2-3, 7, 9

M.G.L. c. 140, § 129C .................................................................................................2

M.G.L. c. 140, § 131 .......................................................................................2-3, 7, 9

M.G.L. c. 140, § 131P .................................................................................................2

M.G.L. c. 269, § 10.................................................................................................1, 2

N.C. Gen. Stat. § 14-288.7 (repealed)........................................................................12

N.C. Gen. Stat. § 14-288.12 (repealed)......................................................................13

N.Y.C. Admin. Code § 8-803......................................................................................17

**Other Authorities**

Commonwealth of Massachusetts, *COVID-19 Order No. 13* (Mar. 23, 2020)..............................4

Commonwealth of Massachusetts, *COVID-19 Order No. 33* (May 18, 2020)................................4

Commonwealth of Massachusetts, *COVID-19 Order No. 63* (Feb. 4, 2021) ...............................4

Commonwealth of Massachusetts, *Declaration of State of Emergency to Respond to COVID-19* (Mar. 10, 2020) ...................................................................................4

World Health Organization, *Statement on the second meeting of the International Health Regulations (2005) Emergency Committee regarding the outbreak of novel coronavirus (2019-nCoV)* (Jan. 30, 2020) ....................................................................4

World Health Organization, *WHO Director-General's opening remarks at the media briefing on COVID-19* (Mar. 11, 2020) ..................................................................4

Xingguang Li, et al., *Evolutionary history, potential intermediate animal host, and cross-species analyses of SARS-CoV-2*, Journal of Medical Virology, 2020:1 ........................3

## INTRODUCTION

The Defendants to this motion have either shut down or severely delayed the processing of firearms licenses. Because the Commonwealth of Massachusetts requires licensure in order to purchase, possess or carry firearms, the Defendants' actions make it impossible for those living within their jurisdictions to obtain and possess firearms. This contravenes the Second Amendment, which guarantees that "the right of the people to keep and bear Arms, shall not be infringed." Accordingly, to vindicate this fundamental right, the Court should order the Defendants to: (1) accept applications for firearms licenses without delay; and (2) process those applications, and issue (or deny) licenses promptly, within the statutory time limits.

## PERTINENT FACTS, STATUTES & REGULATIONS

### A)  A Person Must Have a License in Order to Possess or Acquire a Firearm

The laws of Massachusetts prohibit people from possessing any type of firearm[1]—handgun, rifle or shotgun—unless they hold an appropriate license. Some exceptions apply to certain nonresidents and new residents, but none of these exceptions pertain to the Plaintiffs here. *See generally Commonwealth v. Paul*, 96 Mass. App. Ct. 263, 267 n.2, 132 N.E.3d 544 (2019). Two overlapping statutory provisions create this prohibition. The first is M.G.L. c. 269, § 10(a) which, in its first paragraph, prohibits the "possession" of any handgun away from one's "residence or place of business" unless one holds a license to carry firearms ("LTC"). The second paragraph of this statutory subpart prohibits the possession of "a rifle or shotgun" away from one's "residence or place of business," unless one holds either an LTC or a firearms

---

[1] Massachusetts law defines a "firearm" as, pertinently, "a stun gun or a pistol, revolver" or (in substance) a rifle or shotgun with a short barrel. *See* M.G.L. c. 140, § 121. The term does not include a rifle or shotgun that does not have a short barrel. *See id.* In contrast, federal law, in contrast, a "firearm" is (among other things) any handgun, rifle or shotgun. *See* 18 U.S.C. § 921(a)(3). Unless otherwise indicated, we use the term "firearm" in accordance with its federal definition, that is, to refer to a handgun, rifle or shotgun.

identification card ("FID"). *See* M.G.L. c. 269, § 10(a). Thus, the net effect of these two parts of M.G.L. c. 269, § 10(a) is to prohibit the unlicensed possession of handguns, rifles and shotguns away from the home. The punishment for a violation of these parts of the statute is imprisonment from a minimum of 18 months to a maximum of five years. *See id.*

The next statutory provision is M.G.L. c. 269, § 10(h)(1), which provides that anyone who "owns, possesses or transfers a [handgun], rifle, shotgun or ammunition without complying with the provisions of section 129C of chapter 140" is subject to imprisonment for up to two years and a fine of up to $500. Section 129C, in turn, makes it illegal to "own or possess any [handgun], rifle, shotgun or ammunition" unless one holds a LTC or FID. *See* M.G.L. c. 140, § 129C. By its terms, this provision applies in all places, including in one's home or place of business. *See* M.G.L. c. 269, § 10(h)(1). Finally, and notably, M.G.L. c. 140, § 129B provides that a FID "shall not entitle a holder thereof to possess . . . (i) a large capacity firearm [*i.e.* handgun] . . . ; or (ii) a non-large capacity firearm [*i.e.* handgun]." *See* M.G.L. c. 140, § 129B(6). Thus, a person faces criminal punishment if they possess a handgun, rifle or shotgun without either a LTC or FID, and a FID does not authorize the possession of handguns. The penalty is greater if the possession takes place outside the home.

In order to obtain either license—either a LTC or a FID—a person must meet various requirements related to (among other things) their age, criminal background, mental health, training and "suitability." *See generally* M.G.L. c. 140, §§ 129B(1)-(1½), 131(d), 131P(a). This case does not concern any of these requirements. Rather, this case concerns the Defendants' refusal to process, or severe delay in processing, license applications. In order to obtain licensure, a person needs to apply to their designated "licensing authority," which is generally

the police chief[2] where they reside or have a place of business. *See* M.G.L. c. 140, §§ 121, 129B(1), 131(d); *see also Commonwealth v. Adams*, 482 Mass. 514, 531, 125 N.E.3d 39 (2019). The Commonwealth's licensing statutes require licensing authorities to approve or deny license applications with some degree of promptness. Among other things, they must forward applications and fingerprints to the Massachusetts State Police within 7 days, who must then complete a background investigation within 30 days, and the licensing authorities must approve or deny applications within 40 days of their receipt. *See* M.G.L. c. 140, §§ 129B(2)-(3), 131(e). And significantly, Massachusetts law affirmatively forbids licensing authorities from issuing a license before the State Police has advised them that the applicant passes the background investigation. *See* M.G.L. c. 140, §§ 129B(d)(2), 131(e). Notwithstanding these time limits, the Defendants are refusing to accept and process license applications promptly, or refusing to accept and process them at all. As a result, the Plaintiffs are unable to obtain licenses—and accordingly, they are unable to exercise their right to keep and bear arms by acquiring and possessing firearms for their protection.

### B) The Defendants Have Closed Off or Severely Delayed Access to Firearms Licenses, Preventing the Plaintiffs from Acquiring or Possessing Firearms

As we all know, the SARS-CoV-2 virus, and the COVID-19 disease it causes, first emerged over 15 months ago in approximately November 2019 and rapidly spread throughout the world.[3] On January 30, 2020, the World Health Organization declared COVID-19 a Public

---

[2] If not the "chief of police," then "the board or officer having control of the police in a city or town, or persons authorized by them." M.G.L. c. 140, § 121.

[3] *See generally* Xingguang Li, et al., *Evolutionary history, potential intermediate animal host, and cross-species analyses of SARS-CoV-2*, Journal of Medical Virology, 2020:1, 4, 8, Ex. 1 to Dec. of David D. Jensen (submitted herewith).

Health Emergency of International Concern,[4] and on March 11, 2020, the WHO declared COVID-19 a pandemic.[5] On March 10, 2020, Governor Charlie Baker declared a state of emergency "in effect until notice is given," and this state of emergency remains in force to the present day.[6] Like many other states, the Commonwealth of Massachusetts initially mandated the closure of all businesses and activities that were not considered "essential,"[7] and it then moved into a phased reopening of businesses and services, beginning on May 18, 2020.[8] Current regulations allow most gatherings (business or otherwise) to remain open, subject to reduced capacity limits, mask requirements and sector-specific requirements.[9]

   Notwithstanding this, many police departments throughout Massachusetts are either refusing to process firearm license applications, or else they are processing applications—often after receiving notice of this suit—but with untenably long delays. First is the Boston Police Department, which never formally stopped processing license applications, but has deprioritized it to the point that individuals seeking licenses must wait more than months and months just to submit applications. When Plaintiff Alejandro Pirez contacted them in May 2020 to submit an application for a LTC, they placed him on a waiting list. *See* Dec. of Alejandro Pirez (submitted herewith) ¶¶ 6-7. Mr. Pirez waited for months and then, on February 22, 2021—after the City of

---

[4] *See* World Health Organization, *Statement on the second meeting of the International Health Regulations (2005) Emergency Committee regarding the outbreak of novel coronavirus (2019-nCoV)* (Jan. 30, 2020), Ex. 2 to Jensen Dec.

[5] *See* World Health Organization, *WHO Director-General's opening remarks at the media briefing on COVID-19* (Mar. 11, 2020), Ex. 3 to Jensen Dec.

[6] *See* Commonwealth of Massachusetts, *Declaration of State of Emergency to Respond to COVID-19* (Mar. 10, 2020), Ex. 4 to Jensen Dec.

[7] *See* Commonwealth of Massachusetts, *COVID-19 Order No. 13* (Mar. 23, 2020), Ex. 5 to Jensen Dec.

[8] *See* Commonwealth of Massachusetts, *COVID-19 Order No. 33* (May 18, 2020), Ex. 6 to Jensen Dec.

[9] *See* Commonwealth of Massachusetts, *COVID-19 Order No. 63* (Feb. 4, 2021), Ex. 7 to Jensen Dec.

Boston had learned of this lawsuit—the Department contacted Mr. Pirez and asked hi. To to submit an application online, which he did promptly. *See id.* at ¶¶ 8-9. But it still remains unclear when they will actually process it. *See id.* at ¶ 10.

The problems go beyond Mr. Pirez. Ryan Walker, who is a member of Plaintiff Second Amendment Foundation ("SAF"), contacted the Boston Police Department to apply for a license in June 2020. *See* Dec. of Ryan Walker (submitted herewith) ¶¶ 2, 6. Mr. Walker contacted the Department on multiple occasions between June 2020 and February 2021 for updates. *See id.* at ¶¶ 6-11. The Department finally permitted him to upload his application in December 2020, but as of February 26, 2021, the Department still has not processed it, telling him only that there are "hundreds" of applications pending. *See id.* at ¶¶ 8-11. Similarly, Sara Harold, who is also a member of Plaintiff SAF, first contacted the Boston Police Department to apply for a license in August 2020. *See* Dec. of Sara Harold (submitted herewith) ¶¶ 2, 6. The Department told her she would need to wait for an appointment, and purportedly put her in the queue. *See id.* at ¶¶ 6-7. She contacted the Department to follow up later in August, as well as in October and December of 2020 and January of this year, but no one ever returned her messages. *See id.* at ¶¶ 7-10. It will, by all indications, be months and months before she can formally "begin" the process by providing an application, fingerprints and the required documentation.

Next is the Chelsea Police Department. Plaintiff Sawandi Cassell was able to submit an application for a LTC to them in July 2020, but as of March 1, 2021—over seven months later— he still has received any response to his application. *See* Dec. of Sawandi Cassell (submitted herwith) ¶¶ 6-10. Moreover, when he contacted the Firearms Records Bureau to check on the status of his application, they advised him that the police department had not even begun to process it. *See id.* at ¶ 7. The department hasn't disputed this, and in fact it told him it could be

"up to a year" before they processed his application. *See id.* at ¶ 8. Their website candidly admits that "[d]ue to the ongoing COVID-19 crisis, applications for firearms license are delayed." *See* Jensen Dec. Ex. 8.

Then there is the Lunenberg Police Department. Plaintiff Jarrad Brooks contacted them in November 2020, not to submit an initial application (which requires fingerprints), but instead to apply for the renewal of his LTC—which has now expired. *See* Dec. of Jarrad Brooks (submitted herewith) ¶¶ 5, 10. He contacted the police department by telephone in November, December and January, but no one ever returned his call. *See id.* ¶¶ 5-9. He also tried to appear in person in November, but the doors were locked, and he could not obtain any assistance when he attempted to call. *See id.* ¶ 7. He now faces the imminent expiration of the 90-day "grace" period that attaches to his expired LTC, which will (among other things) require him to relinquish possession of his firearms. *See id.* ¶ 10. But if he could have just submitted a renewal application prior to the expiration of his LTC, then this would not have been necessary, even if the Department had taken months to process it. *See* M.G.L. c. 140, § 131(i) ("if the licensee applied for renewal before the license expired, the license shall remain valid after its expiration date").

Finally, it appears that the Cambridge Police Department is no longer refusing to accept firearm license applications, in the abstract, but they are (per their website) refusing to take fingerprints. *See* Dec. of Gene Hall (submitted herewith) ¶¶ 11, 13 & Ex. C. When Plaintiff Gene Hull first contacted the Cambridge Police Department in August 2020, they advised him that they were "not currently processing new applications for LTC." *See id.* ¶ 6 & Ex. A. At the end of January 2021, the Cambridge Police Department Mr. Hull that they still were not "processing" applications, although Mr. Hull was able to email his application to the assigned officer. *See id.* ¶¶ 9-10. Then (after learning of this lawsuit), the Department contacted Mr. Hull and arranged to

take his fingerprints on February 11, 2021. *See id.* ¶ 11. Notwithstanding this, their website continues to state, "No fingerprint services are available at this time." *Id.* ¶ 13 & Ex. C. Again, Massachusetts law prohibits licensing authorities from issuing firearms licenses until Massachusetts State Police have "certified, in writing, that the information available . . . does not indicate that the possession of a firearm . . . by the applicant would be in violation of state or federal law," and to obtain this response licensing authorities must provide "the applicant's fingerprints." *See* M.G.L. c. 140, § 131(e); *see also id.* § 129B(d)(2). Moreover, when Mr. Hull provided his fingerprints, the officer he met with said it would likely take two to three months to process his application. *See* G. Hull Dec. ¶ 12.

## **ARGUMENT**

As the Court is aware, preliminary equitable relief turns on the application of four factors: (1) the likelihood of success on the merits; (2) the likelihood of irreparable injury in the absence of an injunction; (3) the balance of equities; and (4) the public interest. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted). The first two factors are the most important, *see Gonzalez-Droz v. Gonzalez-Colon*, 573 F.3d 75, 79 (1st Cir. 2009) (citation omitted), and the probability of success on the merits is often the "touchstone" consideration, *see Boston v. Super*, 531 F.3d 1, 11 (1st Cir. 2008) (*quoting Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 674 (1st Cir. 1998). We address these considerations in turn.

### I)  The Plaintiffs are Likely to Succeed on the Merits

The Plaintiffs are likely to succeed on the merits because categorical bars on the ability to acquire functional firearms are per se unconstitutional. The refusal to process license applications stands as just such a categorical bar, as it precludes individuals from acquiring or possessing firearms or ammunition. Similarly, severe delays in process applications, or in even accepting them in the first place, likewise stand as complete bars on the ability to acquire and

possess firearms. And while the COVID-19 pandemic will end at *some* point in the future—and presumably along with it, the Defendants' inaction in the processing of licenses—no end is presently in sight. As things stand, Defendants' bar is indefinite.

Significantly, the handgun "bans" that the Supreme Court overturned in *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), were not laws that "banned" handguns per se, but instead, that prohibited the issuance of handgun registrations, while simultaneously banning the possession of unregistered guns. Specifically, the District of Columbia laws at issue in *Heller* made it illegal to "possess" a gun in the absence of a "registration certificate," D.C. Code § 7-2502.01(a) (2001) (amended), and they then provided that "[a] registration certificate shall not be issued for a . . . [p]istol not validly registered to the current registrant in the District prior to September 24, 1976," *id.* § 7-2502.02(a)(4) (amended); *see also Heller*, 554 U.S. at 575. The Court's conclusion was that "[a]ssuming that [the petitioner] is not disqualified from the exercise of Second Amendment rights, *the District must permit him to register his handgun*[.]" *Heller*, 554 U.S. at 635 (emphasis added). Furthermore, the Court found this law unconstitutional without regard to the standard of scrutiny, that is, "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights." *Id.* at 628-29. Similarly, the Chicago laws at issue in *McDonald* made it illegal to "possess . . . any firearm unless [a] person is the holder of a valid registration certificate," Chicago, Ill., Municipal Code § 8–20–040(a) (2009) (repealed), and then simultaneously provided that "[n]o registration certificate shall be issued for any . . . handguns," *id.* § 8–20–050(c) (2009) (amended); *see also McDonald*, 561 U.S. at 750. Finding the Second Amendment applicable against state and local governments, the Court reversed the lower court decisions that had granted the City of Chicago's motion to dismiss. *Id.* at 791.

While there is some debate about the full import of the decisions in *Heller* and *McDonald*, this much is irreducible: The local laws that the Court invalidated were not, strictly speaking, laws that completely "banned" handguns. Rather, they were laws that prohibited people from obtaining the permits that were necessary to obtain and own handguns.

It is otherwise well established that when governments require people to obtain permits in order to exercise their constitutional rights, they must—other issues aside—satisfy basic procedural protections. Specifically, they must not "place[] 'unbridled discretion in the hands of a government official or agency.'" *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225 (1990) (*quoting City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 757 (1988)). Further, and more pertinent here, a licensing system "that fails to place limits on the time within which the decisionmaker must issue the license is impermissible." *Id.* at 226 (*citing Vance v. Universal Amusement Co.*, 445 U.S. 308, 316 (1980); *Freedman v. Maryland*, 380 U.S. 51, 59 (1976)).

The problem here does not appear to be a lack of statutory time limits, as the Commonwealth's gun licensing laws (as stated) require officials to approve or deny applications within 40 days of their receipt, as well as to promptly send applications and fingerprints to the State Police for background checks. *See* M.G.L. c. 140, §§ 129B(2), 131(e). Moreover, the Commonwealth's laws entitle individuals to "submit [applications] to the licensing authority" where they "resid[e] or hav[e] a place of business," without suggesting that the licensing authority might be free to refuse to accept applications, or to stop the time limits from starting by delaying the submission of applications into the future. *See* M.G.L. c. 140, §§ 129B(1), 131(d). Rather, the problem is that the Defendants have adopted policies, customs and practices that delay the acceptance or processing of applications notwithstanding these statutory limits. 42 U.S.C. § 1983 serves to redress policies, customs and practices that deprive people of their

constitutional rights, even if those policies, customs and practices independently violate state law. *See McNeese v. Bd. of Education*, 373 U.S. 668, 672 (1963) ("It is immaterial whether respondents' conduct is legal or illegal as a matter of state law.") (citation omitted); *see also Patsy v. Bd. of Regents*, 457 U.S. 496, 500-01 (1982) ("exhaustion is not a prerequisite to an action under § 1983").

Many reported judicial decisions that concern officials' refusal to process firearms licenses rest on state law grounds, substantively ruling that state licensing statutes tacitly forbid officials from refusing to distribute, accept or consider applications. *See Salute v. Pitchess*, 132 Cal. Rptr. 345, 347, 61 Cal. App. 3d 557 (Cal. Ct. App. 1976) (sheriff has "duty . . . to make such an investigation and determination, on an individual basis, on every application"); *Motley v. Kellogg*, 409 N.E.2d 1207, 1211 (Ind. Ct. App. 1980) ("it is reasonable to assume the legislature intended that when those persons applied to the chief, they would be furnished an application"); *De Vito v. McGuire*, 475 N.Y.S.2d 730, 731, 124 Misc. 2d 65 (Sup. Ct. 1984) (police department could not refuse to accept application from individual under 21 where statute did not have a minimum age); *Held v. Hanlin*, 244 P.3d 895, 899, 239 Or. App. 486 (Or. Ct. App. 2010) (sheriff could not refuse to process handgun license application after learning that applicant had medical marijuana card). In the context of the Second Amendment, one recent case from the District of Connecticut is particularly pertinent. *See Connecticut Citizens Defense League v. Lamont*, No. 3:20-cv-00646, 2020 WL 3055983, *1 (D. Conn. Jun. 8, 2020) (hereinafter "*CCDL v. Lamont*").

In that case, various Connecticut officials refused to take fingerprints in connection with firearm license applications, notwithstanding a state law that directed them to do so, because the governor had issued a COVID-19 executive order that gave them discretion to refrain from taking fingerprints. *See id.* at *1; *see also* Conn. Gen. Stat. § 29-17c(a). Connecticut law

prohibits people from acquiring firearms or carrying handguns without permits, although it does not prohibit unlicensed individuals (not otherwise prohibited) from possessing firearms. *See CCDL v. Lamont*, 2020 WL 3055983 at *2 (*citing* Conn. Gen. Stat. §§ 29-33(b), 29-35(a)) (other citations omitted); *see also* Conn. Gen. Stat. § 29-37a(c). As in Massachusetts, Connecticut's gun permitting statutes impose time limits on the approval or denial of permits, ranging from 60 days to 90 days (depending on the type of permit at issue). *See CCDL v. Lamont*, 2020 WL 3055983 at *4 (*citing* Conn. Gen. Stat. §§ 29-28(b), 29-28a(b), 29-36g(b)(2)) (other citations omitted); *see also* Conn. Gen. Stat. § 29-37q(a). And also as in Massachusetts, an individual seeking a firearms license must normally submit fingerprints for a background check. *See CCDL v. Lamont*, 2020 WL 2055983 at *3 (*citing* Conn. Gen. Stat. §§ 29-29(b), 29-36g); *see also* Conn. Gen. Stat. § 29-37q(a). Thus, the suspension of fingerprinting services resulted in individuals being unable "even to initiate and access th[e] process" for obtaining firearms. *See id.* at *18. "One cannot exercise the right to possess a handgun in the home for self-defense if one is prevented from acquiring a handgun in the first place." *Id.* at *20.

The court issued a preliminary injunction directing the defendant officials to resume fingerprinting services. *See id.* at *24-25. The court's opinion focused mostly on handguns, which is appropriate, given that handguns are "the quintessential self-defense weapon," and that self-defense is "the core lawful purpose" of the Second Amendment. *See Heller*, 554 U.S. at 629. In doing so, the court rejected the defendant officials' argument that "a 'temporary delay' . . . does not result in injury" by drawing an analogy to conduct the First Amendment protects. *See CCDL v. Lamont*, 2020 WL 2055983 at *20-21. The court explained that "a gag order barring plaintiffs from exercising their First Amendment free speech rights for the balance of the COVID-19 crisis" would result in "injury despite the 'temporary' nature of the crisis." *Id.* at *20.

Moreover—and as may well become directly pertinent in the case at bar—the court rejected the defendants' argument that their plans to resume fingerprinting in the future made the case moot, *see id.* at *13-17, or made injunctive relief inappropriate, *see id.* at *24.

As to the level of scrutiny, the court concluded that it did not need to decide between intermediate and strict scrutiny because "the indefinite suspension of fingerprinting that is essential to the issuance of a pistol permit does not meet even the lower standard of intermediate scrutiny." *Id.* at *20. While it was "compellingly important" to protect both individuals and members of law enforcement from the risk of COVID-19, "the COVID-19 crisis does not mean that government officials have limitless discretion to intrude on the rights of the people." *Id.* at *21-22. At the time the court issued its injunction in June 2020, nearly three months after government officials had issued emergency closure orders, the defendant officials "ha[d] not shown that there continue[d] to be a substantial fit between the goal of protecting people from COVID-19 and a suspension of all fingerprinting collection requirements." *Id.* at *22. Among other things, some defendant officials had already resumed fingerprinting services for firearms licenses, and the remaining defendants had indicated that they could so in the future. *See id.* Thus, there was no longer "a reasonable and substantial fit." *Id.* And as the defendant officials had "continue[d] to routinely collect fingerprints from arrestees" at all points in time, it was not a situation where the risks of taking fingerprints were insurmountable. *See id.* at *22-23.

Other decisions are instructive. One is *Bateman v. Perdue*, 881 F. Supp. 2d 709 (E.D.N.C. 2012), which concerned North Carolina laws providing that made it illegal "to transport or possess off [one's] own premises any dangerous weapon" during a declared state of emergency. *See id.* at 711 (*quoting* N.C. Gen. Stat. § 14-288.7 (repealed)). These laws also allowed government officials to prohibit or restrict "the possession, transportation, sale,

purchase, storage, and use of dangerous weapons and substances" during such emergencies. *See id.* (*quoting* N.C. Gen. Stat. § 14-288.12(b) (repealed)). The court concluded that even though the "state of emergency" prohibitions "may be limited in duration," they "strip peaceable, law abiding citizens of the right to arm themselves in defense of hearth and home, striking at the very core of the Second Amendment." *Id.* at 716. Thus, those laws, "much like those involved in *Heller*, are at the 'far end of the spectrum of infringement on protected Second Amendment rights.'" *Id.* (*quoting United States v. Marzzarella*, 614 F.3d 85, 97 (3d Cir. 2010)).

In light of that degree of infringement, the court applied a strict scrutiny standard of review. *See id.* at 715. The court reasoned that while there was a compelling interest in public safety and crime prevention, the state-of-emergency restrictions were not narrowly tailored to serve that interest. *See id.* at 716. Specifically, "[t]hey do not target dangerous individuals or dangerous conduct. Nor do they seek to impose reasonable time, place and manner restrictions by, for example, imposing a curfew to allow the exercise of Second Amendment rights during circumscribed times." *Id.* Rather, they "effectively ban[]" the public "from engaging in conduct that is at the very core of the Second Amendment at a time when the need for self-defense may be at its very greatest." *Id.* (*citing Heller*, 554 U.S. at 595). The court accordingly had no choice but to conclude that the restrictions were invalid as-applied. *Id.*

Another pertinent case is this Court's decision granting a preliminary injunction against the closure of firearms and ammunition retailers in *McCarthy v. Baker*, No. 1:20-cv-10701 (D. Mass. filed Apr. 9, 2020). This Court found the closure of retailers was a substantial burden on the right to keep and bear arms, notwithstanding the availability of private sales, and one that lacked justification, particularly given the passage of time. *See id.*, Doc. No. 93, at pp. 51-56. If the COVID-19 pandemic does not justify a shutdown of gun and ammunition retailers, then it is

difficult to see how it could justify a shutdown of the licensing process that is necessary to access those gun and ammunition retailers in the first place.

And certainly, there is ample authority that the Second Amendment cannot tolerate a closure of firearms distribution channels. In *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2009), the Court of Appeals for the Third Circuit evaluated the import of *Heller*, and particularly, of three examples of regulations that the Court had explained it did not intend "to cast doubt on." *See id.* at 91-92 (*quoting Heller*, 554 U.S. at 626). Those were "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 91 (*quoting Heller*, 554 U.S. at 626-27). The court concluded, pertinently, that "prohibiting the commercial sale of firearms . . . would be untenable under Heller." *Id.* at 92 n.8. And notably, the Court of Appeals for the Ninth Circuit agrees that "a total prohibition on the commercial sale of firearms" is "'untenable under *Heller*.'" *Teixeira v. County of Alameda*, 822 F.3d 1047, 1057 (9th Cir. 2016) (*quoting Marzzarella*, 614 F.3d at 92 n.8). But this precisely what a refusal to issue firearms licenses does in a state, like Massachusetts, that requires licensure to purchase or possess firearms: It creates a prohibition on the commercial sale of firearms.

The Court of Appeals for the First Circuit has ruled that "the appropriate level of scrutiny must turn on how closely a particular law or policy approaches the core of the Second Amendment right and how heavily it burdens that right." *Gould v. Morgan*, 907 F.3d 659, 670 (1st Cir. 2019) (*citing Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 195 (5th Cir. 2012); *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011)). Specifically, "[a] law or policy that burdens conduct falling within the core of the

-14-

Second Amendment requires a correspondingly strict level of scrutiny, whereas a law or policy that burdens conduct falling outside the core of the Second Amendment logically requires a less demanding level of scrutiny." *Id.* The "core" Second Amendment right that the First Circuit referenced in *Gould* was "'the possession of operative firearms for use in defense of the home' by responsible, law-abiding individuals." *Id.* (*quoting Hightower v. City of Boston*, 693 F.3d 61, 72 (1st Cir. 2012)). That is just where the conduct at issue here strikes, for the inability to obtain licenses precludes law-abiding citizens from obtaining operative firearms to use in defense of the home. Thus, should this Court apply a tiered standard of scrutiny,[10] it should be a strict one.

Under a strict scrutiny approach, a law must be "'narrowly tailored to serve a compelling state interest.'" *Marzzarella*, 614 F.3d at 99 (*quoting FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 465 (2007)). "If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *United States v. Playboy Entertainment Group*, 529 U.S. 803, 813 (2000) (*citing Reno v. ACLU*, 521 U.S. 844, 873 (1997)). The law is presumed to invalid, with "the government bear[ing] the burden of rebutting that presumption." *Marzzarella*, 614 F.3d at 99 (*citing Playboy*, 529 U.S. at 817). The burden here—a categorical ban on the acquisition of operative arms by the law-abiding—cannot be sustained under this standard.

The Plaintiffs do not dispute a compelling government interest in preventing the spread of a pandemic illness. But nothing makes a blanket ban on processing licenses—and hence, on

---

[10] Most decisions addressing burdens on the right to keep and bear arms use the tiered scrutiny approach that has its genesis in the Supreme Court's well known *Carolene Products* footnote. *See United States v. Carolene Products Co.*, 304 U.S. 144, 152 n.4 (1938). However, this analytic model is not the only means of evaluating burdens on constitutional rights, nor is it necessarily the appropriate model in the Second Amendment context. Notably, the First Circuit relied primarily on historical provenance and tradition to evaluate restrictions on minors in *United States v. Rene E.*, 583 F.3d 8, 12-16 (1st Cir. 2009). We acknowledge that, in *McCarthy*, this Court indicated that *Gould* bound it to this approach.

obtaining guns and ammunition—"necessary" to achieve that interest. Moreover, a blanket

refusal is very plainly not narrowly tailored, as demonstrated by the fact that other licensing

authorities have continued to process them, and some of the Defendants in this action of resumed

processing once they learned of this case. Put simply, if the Commonwealth can establish

conditions that safely permit people to purchase alcohol, hardware, and office supplies, then the

Defendants can establish conditions that safely permit people to apply for firearms licenses. *Cf.*

*Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir. 2012) ("There is no suggestion that some unique

characteristic of criminal activity in Illinois justifies the state's taking a different approach from

the other 49 states.").

And indeed, while an intermediate scrutiny should not apply to a broad preclusion on

core conduct, the failure to process license applications would not pass even review under this

level of scrutiny. The decision in *McCullen v. Coakley*, 573 U.S. 464 (2014), is instructive, as it

shows the importance of narrow tailoring considerations in the intermediate scrutiny context.

There, the Court declined to apply strict scrutiny to a Massachusetts law that created a 35 foot

perimeter around the entrances of abortion clinics because the restriction was content-neutral.

*See id.* at 478-85. But even though strict scrutiny did not apply, and the government thus did not

need to use the "'least restrictive or least intrusive means of' serving the government's interests,"

the restriction still needed to be "narrowly tailored." *Id.* at 486 (*quoting Ward v. Rock Against*

*Racism*, 491 U.S. 781, 798 (1989)). And specifically, the requirement of narrow tailoring meant

that the law could not "burden substantially more speech than is necessary to further the

government's legitimate interests." *Id.* (*quoting Ward*, 491 U.S. at 799). To determine whether

the law went too far, the Court looked first to the scheme that had previously been in place. *See*

*id.* at 487-90. The Court then considered other states' laws, finding it significant that "no other

State [had] a law that creates fixed buffer zones around abortion clinics," although there were some localities that did. *See id.* at 490 & n.6. The Court next looked at other Massachusetts laws, as well as federal laws and some local laws, to find additional regulatory alternatives. *See id.* at 490-93. Notably, New York City's restriction was both smaller (15 feet) and more circumscribed in that it prohibited "follow[ing] and harass[ing]" within the perimeter, not just "standing." *See id.* at 491 (quoting N.Y.C. Admin. Code § 8-803(a)(3)). All of this led to the conclusion that the 35 foot buffer was unconstitutional because it "burden[ed] substantially more speech than necessary to achieve the Commonwealth's asserted interests." *Id.* at 490. This same analysis is fatal to the Defendants' closure, or effectual closure, of the means for their citizens to acquire functional arms for their defense. It is obvious that effective options are available that would avoid unnecessarily burdens on the right to keep and bear arms.

As the Supreme Court itself recognized in *Heller*, "[w]e know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach. The very enumeration of the right takes out of the hands of government— even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon." *Heller*, 554 U.S. at 634. So, while the effective closure of gun licensing would fail to pass constitutional muster under a standard-of-scrutiny based review, the reality is that any standard of review would be inappropriate to use because a blanket ban on obtaining arms is unconstitutional without regard to the interests cited.

**II)      An Injunction is Needed to Prevent Irreparable Injury**

It is well established that the deprivation of constitutional rights of a personal nature, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Ezell*, 651 F.3d at 699. And, while the Court's decision in *Elrod*

concerned First Amendment rights, the First Amendment's protections are in many respects the most analogous to those of the Second Amendment, as it is these two provisions of the Bill of Rights that protect individuals' ability to engage in affirmative conduct by (for example) speaking, or practicing a religion, or keeping and bearing arms. As such, when "look[ing] to other constitutional areas for guidance[,] . . . the First Amendment is the natural choice." *Marzzarella*, 614 F.3d at 89 n.4.

The right to keep and bear arms, as a personal right, is something that people are entitled to enjoy in fact, rather than through the fiction of a money damages judgment. *See Ezell*, 651 F.3d at 699 ("Infringements of this right cannot be compensated by damages."). Indeed, there has been little disagreement that substantial burdens on the right to keep and bear arms stand as irreparable injuries. *See Ezell*, 651 F.3d at 699; *Stilp v. Contino*, 613 F.3d 405, 409 (3d Cir. 2010); *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 149 (D.D.C. 2016); *CCDL v. Lamont*, 2020 WL 3055983 at *18-19. Moreover, this is not a situation where there is merely a possibility that rights will be infringed in the future. Rather, the Plaintiffs in this case have all "altered [their] behavior" to avoid engaging in protected conduct. *See Blount v. Redmond*, 649 F. Supp. 319, 332 (D. Me. 1986) (*quoting Rushia v. Town of Ashburnham*, 701 F.2d 7, 10 (1st Cir. 1983)). If the Defendants were processing licenses, or doing so promptly, then the Plaintiffs would have been able to obtain guns.

### III)     The Balance of Hardships Favors the Plaintiffs

The issue for this consideration is "the balance of relevant impositions, *i.e.*, the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004) (*quoting Ross-Simons of Warwick, Inc. v. Baccarat*, 102 F.3d 12, 14 (1st Cir. 1996)); *see also*

*Corporate Technologies, Inc. v. Harnett*, 731 F.3d 6, 9 (1st Cir. 2013) ("the balance of hardships as between the parties"). And significantly, this Court's injunction will only allow people to obtain FIDs and/or LTCs—and hence, to obtain firearms—if they otherwise satisfy the public safety requirements that the Commonwealth has laid down as prerequisites to gun ownership.[11] Indeed, the Plaintiffs here do not seek to be excused from any of these requirements, but rather, they seek to compel their local police authorities to apply them—something that requires those police authorities to accept and process license applications in the first instance.

### IV)     The Public Interest Favors Issuance of the Requested Injunction

If the Plaintiffs' claim is meritorious, then *ipso facto* a preliminary injunction in support of that claim is in the public interest. *See Hyde Park Partners, L.P. v. Connolly*, 839 F.2d 837, 853 (1st Cir. 1988). "[T]he public interest supports requiring the Government to obey the Constitution[.]" *Reid v. Donelan*, 390 F. Supp. 3d 201, 227 (D. Mass. 2019). "[P]ublic interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution." *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005). "[N]either the Government nor the public generally can claim an interest in the enforcement of an unconstitutional law." *American Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 251 n.11 (3d Cir. 2003), *aff'd*, 542 U.S. 656 (2004).

Moreover, the precise relief that the Plaintiffs seek is also in the public interest. The Plaintiffs here seek an injunction that orders the Defendants to comply with the parameters that the General Court has already established—by accepting applications for processing, which is

---

[11] We do not mean to suggest that a state *without* a licensing or permitting system for the acquisition of guns would be free to close off all legal channels for the acquisition of guns. Rather, we wish to highlight that, on the facts presented here, the people who would benefit are people who meet the Commonwealth's regulatory requirements.

implicit in the creation of the licensing regime itself, and by doing so within the time limits that the General Court already determined to be appropriate.

Thus, if the Defendants' refusal to accept licenses applications, or to process them promptly, is unconstitutional—and we respectfully submit that it is—then it is in the public interest to enjoin the Defendants adhere to the regulatory framework that already applies.

## **CONCLUSION**

In 2010, the Supreme Court proclaimed that the Second Amendment was not a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald*, 561 U.S. at 780. More recently, Justice Thomas lamented that lower courts have "general[ly] fail[ed] to afford the Second Amendment the respect due an enumerated constitutional right." *Silvester v. Becerra*, 138 S. Ct. 945, 945 (2018) (Thomas, J., dissenting from denial of certiorari). Plaintiffs have clearly demonstrated they are likely to prevail on the merits, and currently face irreparable injury, for the actions of the Defendants strike at the very core of their Second Amendment rights.

For the foregoing reasons, Plaintiffs respectfully ask that this Court grant an order directing Defendants Commissioner Long,[12] Commissioner Bard, Chief Kyes and Chief Gammel to accept license applications for processing without delay, and to then process and approve those applications and issue licenses, or deny them where appropriate, within the 40-day timeframe that the Commonwealth's laws provide.

---

[12] Gregory Long is currently the acting Commissioner of the Boston Police Department.

Dated:  March 3, 2021

Respectfully submitted,

THE PLAINTIFFS,

By their attorneys,

 /s/ David D. Jensen
David D. Jensen, Esq.
Admitted *Pro Hac Vice*
David Jensen PLLC
33 Henry Street
Beacon, New York 12508
Tel: 212.380.6615
Fax: 917.591.1318
david@djensenpllc.com

Jason A. Guida
BBO # 667252
Principe & Strasnick, P.C.
17 Lark Avenue
Saugus, MA 01960
Tel: 617.383.4652
Fax: 781.233.9192
jason@lawguida.com

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and paper copies will be sent to those indicated as non-registered participants on March 3, 2021.

/s/ David D. Jensen
David D. Jensen, Esq.

-21-